1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    KRISTY M. P.,[1]                          Case No.  19-cv-00749-TSH

8                    Plaintiff,

9          v.                                  ORDER RE: CROSS-MOTIONS FOR
                                               SUMMARY JUDGMENT
10   ANDREW M. SAUL,
                                               Re: Dkt. Nos. 22, 33
11                   Defendant.

12

13                            I.    INTRODUCTION

14         Plaintiff Kristy M. P. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

15   review of a final decision of Defendant Andrew M. Saul, Commissioner of Social Security,

16   denying Plaintiff's claim for disability benefits.  Pending before the Court are the parties' cross-

17   motions for summary judgment.  ECF Nos. 22 (Pl.'s Mot.), 33 (Def.'s Cross-Mot.).  Pursuant to

18   Civil Local Rule 16-5, the motions have been submitted without oral argument.  Having reviewed

19   the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court

20   hereby **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion for the following

21   reasons.

22                            II.   BACKGROUND

23   A.    Age, Education and Work Experience

24         Plaintiff is 29 years old.  AR 668.  She has no experience doing substantial gainful activity

25   ("SGA").  AR 203.

26

27   _____

     [1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
28   recommendation of the Committee on Court Administration and Case Management of the Judicial
     Conference of the United States.

**B.**     **Medical Evidence**

**1.**     **Childhood, Non-Medical Education Records**

Drs. Jacob Barak, Ph. D. and Robert Maginn, Ph. D., Holley Child Card and Development Center, completed an Annual Psychological Report on Plaintiff, then age 11, after an interview with Plaintiff on February 26, 2003.  AR 399-400.  They reported that Plaintiff's thought processes were oriented, and her global intellectual functioning had been assessed in the average range, however they noted that Plaintiff might not function at that level on a daily basis due to attention deficits and visual motor integration weaknesses.  AR 400.  Plaintiff's insight and judgment were limited.  *Id.*  Her academic functioning had been reported to be below age level expectations.  *Id.*

**2.**     **Chart Notes from LifeLong Medical Care**

In September 2015, Plaintiff attempted to established care through LifeLong Medical Care and met with providers from September 2015 to June 2016.  AR 553-55, 684-95, 957-61. Monique Rosenthal, P.A., noted on April 12, 2016 that Plaintiff needed to reestablish "psych care," and that she had lost SSI due to medication nonadherence.  AR 684.  Plaintiff had last taken prescribed medications in 2011.  *Id.*  The chart notes from LifeLong indicated no unusual psychiatric findings.  Notes from January 22, 2016 indicated normal orientation to time, place, person, and situation.  AR 690.  Notes from Plaintiff's last session, on June 6, 2016, indicated that Plaintiff denied receiving "any other medications" from alternative providers, and that she was seeing a counselor but had "not est[ablished] care with psych."  AR 958.  Those notes also indicated that Plaintiff was oriented to time, place, person, and situation, and that she had appropriate mood and affect.  AR 959.  The culmination of her four visits from September 2015 to June 2016 included a referral to behavioral health, lab work, and a prescription for headache medication and vitamins.  AR 960.

**3.**     **Dr. Kollath's Psychological Evaluation**

On January 18, 2016, at the request of the California Department of Social Services, Plaintiff underwent a complete psychological evaluation with Dr. Ute Kollath, Ph.D.  AR 698-702.  Plaintiff's chief complaint was bipolar disorder.  AR 698.  Plaintiff reported having had

United States District Court
Northern District of California

2

several psychiatric hospitalizations because of anger outbursts up until age eight. *Id.* She reported past use of psychotropic medications but explained that she had stopped taking medications because they "ma[de] her fat." AR 698. She reported that she was unable to work because she did not like being around people, that people made her mad, and that she did not want people telling her what to do. *Id.* She reported that she was diagnosed with bipolar disorder because of anger outbursts, that her anger outbursts occurred frequently, and that the outbursts were triggered by minor stressors and could last up to an hour. AR 698-99. She did not endorse any manic episodes. AR 699. She reported a history of substance abuse. *Id.*

Plaintiff was adequately groomed, her motor activity was intact, her eye contact was good, she was alert, had no speech abnormalities, was fully oriented, and demonstrated abstract thinking, and her fund of knowledge was adequate and her mood stable. AR 700. She had no suicidal ideations, her thought process was intact, linear, and logical, and her thought content was unremarkable. *Id.* She denied hallucinations, paranoia, or delusions. *Id.* Her judgment, intelligence, attention, and insight were fair. *Id.* Her concentration and memory, however, were impaired, her attitude was suboptimal, and her affect was somber. *Id.*

Plaintiff underwent a Folstein Mini Mental Status Exam ("MMSE"), a Wechsler Adult Intelligence Scale – 4th Edition ("WAIS-IV"), a Wechsler Memory Scale – 4th Edition ("WMS - IV"), and a Trail Making Test ("TMT"). *Id.* Plaintiff had no difficulty following simple or moderately complex directions. *Id.* However, Dr. Kollath noted that the test results were "an unreliable representation of [Plaintiff's] [] psychological functioning," and that Plaintiff showed "limited engagement" and "was observed to rush through most of her assignments, [and this] interfered with a full evaluation." *Id.*

Dr. Kollath diagnosed Plaintiff with disruptive mood dysregulation disorder 269.99 (F34.8) and moderate cannabis use disorder. AR 701. He assessed Plaintiff with moderate impairment in ability to maintain adequate pace or persistence to perform complex tasks, and mild impairment in ability follow complex or detailed instructions, to adapt to changes in job routine, to withstand the stress of a routine workday, to interact appropriately with co-workers, supervisors, and the public on a regular basis, and to adapt to changes, hazards, or stressors in a workplace

United States District Court
Northern District of California

3

1   setting.  *Id.*  He opined that Plaintiff was able to manage her own funds.  *Id.*

2       **4.**        **Dr. Catlin's Psychological Evaluation**

3         On January 25, 2016, Plaintiff underwent a psychological evaluation with Dr. Laura

4   Catlin, Psy.D upon referral by one of Plaintiff's representatives.  AR 668-77; *see* AR 84.  Plaintiff

5   approached the examiner in a friendly and cooperative manner, and she was responsive to the

6   examiner and appeared to be a credible historian.  AR 668.  She reported feeling depressed for

7   most of her life and feeling uncomfortable around other people and being often irritated by them.

8   *Id.*  She reported preferring to be by herself because she had great difficulty regulating anger when

9   people annoyed or irritated her.  *Id.*  She reported having difficult being around family members.

10  AR 668-69.  She reported experiencing symptoms of Posttraumatic Stress Disorder ("PTSD")

11  after witnessing someone being shot in front of her.  AR 669.

12        Plaintiff reported that she was not taking any medications.  AR 670.  She reported having

13  been arrested over 10 times for the sale of a controlled substance but reported no history of

14  substance use or abuse.  *Id.*  She reported being psychiatrically hospitalized for two years as a

15  minor but no hospitalizations as an adult.  *Id.*  She reported that in 2012 she participated in out-

16  patient psychotherapy for depressive symptoms, saw a therapist about six times but then

17  terminated her therapy because she felt it was not helping her.  *Id.*

18        Upon mental status examination, Dr. Catlin noted that Plaintiff's level of arousal was

19  normal, her response times were average, she appeared alert and oriented, and she was engaged in

20  the evaluation and able to sustain attention.  *Id.*  Plaintiff was appropriately groomed and

21  maintained good eye contact.  *Id.*  Dr. Catlin noted that Plaintiff appeared withdrawn and guarded,

22  answered questions but offered little detail, and appeared hostile and agitated.  *Id.*  Plaintiff's

23  mood was depressed and anxious, her affect was flat, her thought content showed some negative

24  thinking and paranoia, and she had limited insight and judgment.  *Id.*  However, her thought

25  process was goal directed and logical, and she reported no suicidal thoughts, plans, or intent.  *Id.*

26  She reported auditory hallucinations.  *Id.*  She reported that she slept most of the day, that she

27  didn't "have enough energy to do very much."  AR 671.  Her concentration was very poor, and

28  she had impairments in immediate and delayed memory.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

        Dr. Catlin wrote that during testing Plaintiff was cooperative even when faced with a difficult task and was "prompt, but careful in her responses and appeared to be attentive to the tasks she was working on." *Id.* After administering the WASI, Dr. Catlin noted that Plaintiff scored in the extremely low to borderline range of intellectual functioning and had an IQ score of 61. AR 672. On the RBANS, Plaintiff scored in the extremely low range in the Immediate Memory Index and the severely impaired range in the Delayed Memory Index. *Id.* However, Plaintiff's performance suggested she could learn new information with some practice and repetition. *Id.* Once new information was encoded, Plaintiff could more easily retrieve it when given cues. *Id.* Plaintiff's visual-spatial functioning was severely impaired, her placement on the RBANS language index was in the extremely impaired range, and she scored in the moderately impaired range in attention. AR 672-73. Dr. Catlin diagnosed Plaintiff with severe depressive disorder, PTSD, and features of avoidant personality disorder. AR 674.

13

14

15

16

17

18

19

20

21

22

23

24

        During a functional assessment, Dr. Catlin assessed the following limitations: severe impairments in ability to perform in the workplace, ability to maintain regular attendance, ability to maintain adequate pace and persistence to perform complex or detailed tasks, ability to accept instruction and criticism from supervisors, ability to get along with co-workers or peers, ability to work in coordination or proximity to others without distraction, ability to interact with co-workers, supervisors and public, and ability to use public transportation; moderate to severe impairments in ability to understand and remember detailed instructions and ability to complete a normal workweek; and moderate impairments in ability to maintain attention for a two-hour segment, ability to maintain adequate pace and persistence to perform simple tasks, ability to make simple work-related decisions, ability to understand and remember short and simple instructions, ability to carry out short and simply instructions, ability to transfer to unfamiliar places, and her awareness of normal hazards. AR 675-66.

25

26

27

28

        In opining on Plaintiff's functional limitations, Dr. Catlin opined that Plaintiff had extreme difficulties maintaining social functioning, marked to extreme restriction in her activities of daily living, marked to extreme deficiencies in concentration, persistence or pace, and more than three episodes of decompensation within a twelve-month period. AR 676. She noted that Plaintiff's

5

impairments would cause her to miss more than four days a month and she would not be able to engage in meaningful employment or obtain and retain a job. *Id.*

### 5. Mental Health Records from Bay Area Community Services

Plaintiff received clinical case management and medication management through Bay Area Community Services ("BACS") from June 2016 through October 2017. AR 963-1042, 1276-93. BACS records contain progress notes, evaluations, and opinions from licensed clinical social workers, psychiatrists, and prescribing physician assistants. Plaintiff was initially evaluated by MacKenzie Stuart, MFT on June 1, 2016. AR 965-71. Plaintiff spoke very little during the evaluation, made no eye contact, and did not engage socially. AR 969. She reported often waking up irritated and that she would isolate when it occurred. AR 965. She reported that she had received 20 sessions of psychotherapy in 2010 and "been connected to community psychiatry twice, but only attended one meeting." AR 966. She denied being on any medications and denied any current alcohol or drug use. AR 966-67. Stuart opined that Plaintiff had difficulties with activities of daily living, did not "have the ability to establish and maintain social relationships including support systems," and had "ongoing psychotic and mood [symptoms] which she [was] not well-connected to [treatment] for." AR 965. Stuart diagnosed Plaintiff with severe major depressive disorder, recurrent, with psychotic features. AR 971.

Plaintiff attended four psychiatry appointments at BACS from September 2016 to March 2017. AR 1033-42. Dr. Randall Black, M.D., completed a psychiatric diagnostic evaluation on September 6, 2016, and he opined that Plaintiff had PTSD flashbacks. AR 1036. On September 16, 2016, after a follow-up appointment, Dr. Black diagnosed Plaintiff with Major Depression, Single Episode. AR 1038. He prescribed Prozac, an anti-depressant. *Id.*

On February 13, 2017, Plaintiff met with Dr. Eunjoo Justice, M.D. AR 1039-40. Plaintiff reported that she had been off medications for three months. AR 1039. Her main complaint that day was insomnia. *Id.* She did not feel depressed at that time. *Id.* Dr. Justice prescribed Seroquel (quetiapine), an antipsychotic used to treat bipolar disorder and major depressive disorder.[2] AR

---

[2] Michigan Medicine, University of Michigan, *Quetiapine*, https://www.uofmhealth.org/health-library/d04220a1 (last visited September 10, 2020); WebMD, *Seroquel*,

1   1040.

2      On March 21, 2017, Plaintiff met with a Physician Assistant, Sarah Kaplan.  AR 1041-42.

3   Plaintiff reported that she was on medications mainly for depression and sleep and that she was

4   "doing fine," but her main complaint that day was that she felt sleepy because of the Seroquel and

5   wanted to reduce her dosage.  AR 1041.  She had no other complaints.  *Id.*  Plaintiff denied feeling

6   down or depressed when asked.  AR 1042.  Kaplan noted that Plaintiff was stable.  *Id.*  Because

7   her Seroquel had been making her feel sleepy, Plaintiff had stopped taking it one to two weeks

8   prior "cold turkey."  *Id.*  Kaplan prescribed a reduced dose of Seroquel and told Plaintiff to call her

9   if the dosage was off "before stopping all of a sudden as she felt crappy afterwards for days."  *Id.*

10     On April 3, 2017, Anastacia M. Stanley, MFT, performed a psychiatric diagnostic

11  evaluation on Plaintiff.  AR 1014-20.  Stanley noted that Plaintiff often spoke with very slowed,

12  soft speech and displayed poverty of speech, displayed psychomotor retardation during visits, and

13  struggled with focus.  AR 1015, 1019.  Plaintiff reported that she was often forgetful and needed

14  reminders, and she reported that she had not been able to consistently access health care due to her

15  isolation, anxiety, depression, or mistrust of others.  *Id.*  Plaintiff denied any current or past issues

16  with substance use, AR 1016-17, and Stanley wrote that her mental health symptoms did not

17  appear to be related to the physiological effects of any substance, AR 1019.  Stanley wrote

18  Plaintiff met the criteria for major depressive order, but that she did meet "any other criteria for

19  psychotic disorders, anxiety disorders, mood disorders, or adjustment disorders, at this time."  AR

20  1015, 1019.  Although Plaintiff reported a history of trauma, she did not meet the criteria for

21  PSTD.  *Id.*

22     On April 6, 2017, Stanley prepared a treatment plan for Plaintiff "in order to reduce her

23  symptoms of depression."  AR 1026-27.  She stated as a treatment goals that Plaintiff needed to

24  increase her coping skills from a baseline of no new skills per month to one new skill per month

25  and needed to develop and utilize organizational skills to increase independence in connection

26  with healthcare in the community. AR 1026.

27  ────────────────

28  https://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details (last visited September 10, 2020).

United States District Court
Northern District of California

United States District Court
Northern District of California

1     Plaintiff began meeting with A'zah Williams, MFT, on April 20, 2017.  AR 1276.

2   Williams noted that Plaintiff's symptoms had decreased during his meeting with her, and that she

3   presented calmer and more conversational.  AR 1277.  Plaintiff agreed to connect with a

4   psychiatrist to decrease symptoms of sleepiness and low moods but expressed still not wanting to

5   connect with mental health therapy because "she had other things to prioritize before making a

6   commitment to therapy."  *Id.*  With both Williams and Kaplan the next month, Plaintiff discussed

7   transitioning to a medication other than Seroquel because it was "very sedating drug," though

8   Kaplan noted "that's its purpose."  AR 1278-80.  Plaintiff's main concern with Seroquel was that

9   it made her sleepy during the day.  AR 1281.

10     Plaintiff was hospitalized on May 18, 2017 after "crashing" from ingesting

11   methamphetamine and alcohol.  AR 1246.  After discharge, Plaintiff began staying in transitional

12   housing.  AR 1289.  Williams indicated on June 20, 2017 that Plaintiff had not been taking her

13   prescribed medications but was now taking them, and that she reported a decrease in her

14   symptoms when she took medication as prescribed.  *Id.*

15     By August 4, 2017, Stanley noted that, despite asking for help, Plaintiff repeatedly

16   cancelled appointments or failed to appear.  AR 1292.  A progress note from that date explained

17   that Plaintiff had contacted staff requesting support, but when staff scheduled appointments or

18   times to reach Plaintiff she cancelled.  *Id.*  Stanley had informed Plaintiff's legal advocate that

19   Plaintiff "[would] be closed to case management services by August 20th, if she does not

20   participate, since she has not been participating in services."  Stanley also explained that an

21   attempt at a three-way phone call between Plaintiff and her legal advocate had resulted in Plaintiff

22   "not even saying anything on the line" and "hanging up on the legal advocate."  *Id.*

23     **6.     Other Medical Records**

24     Plaintiff was hospitalized on May 18, 2017, for six days, at John George Psychiatric

25   Pavilion.  AR 1244-46.  She was brought to the hospital voluntary by her case manager and

26   complained of worsening auditory hallucinations, delusions, and irritability.  AR 1245.  After an

27   initial mental status exam, however, "it was quite obvious that [Plaintiff] was not going to quickly

28   stabilize and a decision was made to admit her to inpatient services."  *Id.*  Plaintiff admitted that

8

she had been using methamphetamines, alcohol, and marijuana. *Id.*; AR 1247. She had not been taking Seroquel. AR 1247. In addition to her worsening symptoms, she stated that she had slept very little for the past month, though her discharging doctor, Stuart Gluck, M.D., wrote "of course considering the fact that she was using methamphetamines [that was] to be expected." AR 1245. Dr. Elisa Lau, D.O. assessed Plaintiff with amphetamine-induced psychosis and cannabis abuse. AR 1248. Dr. Gluck noted that Plaintiff's first days admitted involved her "'crashing' from the use of psychostimulants," that after a couple of days she began to stabilize, and that "[u]ltimately [] it was clear that [she] was no longer in need of being in a locked acute care facility and since she had a safe and a very positive placement to which she could go, it was felt that it was appropriate for her to be discharged." AR 1246. Plaintiff's discharge diagnosis indicated schizoaffective disorder, bipolar type, and polysubtance abuse/dependence. AR 1244.

On June 1, 2017, Plaintiff was again hospitalized at John George, this time for eight days. AR 1205-07. Dr. Tamina Isolani-Nagarvala, D.O. noted that Plaintiff "came in after ingesting methamphetamine and alcohol." AR 1208. It did not appear that she had been taking any of her medications since she was discharged on May 23 following her first admission. *Id.* Jeffrey Ung, Occupational Therapist, noted that Plaintiff appeared to have poor activities of daily living for most of her admission and "would benefit from locked subacute to promote further stabilization as she [was] unable to demonstrate insight into her own mental illness and ha[d] a pattern of treatment noncompliance in the community." AR 1211. He noted that Plaintiff had a history of medication non-compliance and would likely continue not taking scheduled medications without an appropriate level of support to prompt her to take them. *Id.* At discharge Plaintiff's diagnosis was listed as schizoaffective disorder, bipolar type and polysubstance dependence. AR 1205.

### III.   SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On August 31, 2015, Plaintiff protectively filed a claim for Supplemental Security Income ("SSI"), alleging disability beginning on March 15, 2011, based on bipolar disorder, mood disorder, and dysthymic disorder. AR 11, 87-90, 99-103, 178-86, 202. On February 12, 2016, the agency denied Plaintiff's claim, finding Plaintiff did not qualify for disability benefits. AR 87. Plaintiff subsequently filed a request for reconsideration, AR 96, which was denied on June 13,

2016, AR 99.  On June 29, 2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 105.  ALJ Kevin Gill conducted a hearing on October 6, 2017.  Plaintiff testified in person at the hearing and was represented by counsel, Britt Harwood, an attorney.  The ALJ also heard testimony from Vocational Expert ("VE") Susan Green.

### A.    Plaintiff's Testimony

Plaintiff testified that she spends most of her time sleeping.  AR 39.  She worked for three to five days for a company in a janitorial role but became agitated once and got into a fight with somebody so the employment ended.  AR 35-36.  Her work involved tasks like mopping, washing dishes, and similar tasks, but she had difficulty finishing her tasks because "the stuff was just so long," "too long."  AR 40.

Plaintiff testified that her ability to concentrate was "not too good," AR 38, that she was not good at handling stress, and that when she was stressed out, she would "tend to fight and argue with people" AR 40.  She couldn't remember the names of her medications and testified that it was sometimes hard for her to remember to take them.  AR 38.

### B.    Vocational Expert's Testimony

The VE testified that a person with Plaintiff's age, education, and work experience, who was limited to simple routine tasks and simple work-related decisions, and who could have only occasional interaction with coworkers and the public, would be able to perform the requirements of representative occupations such as Hand Packager (DOT 920.587-018), a medium and unskilled job at SVP 2, with 76,000 jobs nationally; Industrial Cleaner (DOT 381.687-018), a medium and unskilled job at SVP 2, with 45,000 jobs nationally; and Laundry Worker II (DOT 361.685-018), a medium and unskilled job at SVP 2, with 45,000 jobs nationally.  AR 21.

### C.    Framework for the Determination of Disabled Status, the ALJ's Decision, and Plaintiff's Appeal

A claimant is considered "disabled" under the Social Security Act if two requirements are met.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  First, the claimant must demonstrate "an inability to engage in any substantial gainful activity [("SGA")] by reason of any medically determinable physical or mental impairment which can be expected to

1    result in death or which has lasted or can be expected to last for a continuous period of not less

2    than 12 months." 42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be

3    severe enough that the claimant is unable to perform previous work and cannot, based on age,

4    education, and work experience "engage in any other kind of substantial gainful work which exists

5    in the national economy." *Id.* § 423(d)(2)(A).

6         The regulations promulgated by the Commissioner of Social Security provide for a five-

7    step sequential analysis to determine whether a claimant is disabled.  20 C.F.R. § 404.1520.  The

8    claimant bears the burden of proof at steps one through four.  *Ford v. Saul*, 950 F.3d 1141, 1148

9    (9th Cir. 2020) (citation omitted).

10        At step one, the ALJ must determine if the claimant is presently engaged in SGA, 20

11   C.F.R. § 404.1520(a)(4)(i), defined as "work done for pay or profit that involves significant

12   mental or physical activities," *Ford*, 950 F.3d at 1148 (internal quotations and citation omitted).

13   Here, the ALJ determined Plaintiff had not performed SGA since August 31, 2015, Plaintiff's

14   application date.  AR 13.

15        At step two, the ALJ decides whether the claimant's impairment or combination of

16   impairments is "severe," 20 C.F.R. § 404.1520(a)(4)(ii), "meaning that it significantly limits the

17   claimant's 'physical or mental ability to do basic work activities,'" *Ford*, 950 F.3d at 1148

18   (quoting 20 C.F.R. § 404.1522(a)).  If no severe impairment is found, the claimant is not disabled.

19   20 C.F.R. § 404.1520(c).  Here, the ALJ determined Plaintiff had the following severe

20   impairments: affective disorder, substance use disorder, and personality disorder.  AR 13.

21        At step three, the ALJ evaluates whether the claimant has an impairment or combination of

22   impairments that meets or equals an impairment in the "Listing of Impairments" (referred to as the

23   "listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1.  The listings

24   describe impairments that are considered "to be severe enough to prevent an individual from doing

25   any gainful activity."  *Id.* § 404.1525(a).  Each impairment is described in terms of "the objective

26   medical and other findings needed to satisfy the criteria of that listing."  *Id.* § 404.1525(c)(3).

27   "For a claimant to show that his impairment matches a listing, [she] must meet *all* of the specified

28   medical criteria.  An impairment that manifests only some of those criteria, no matter how

United States District Court
Northern District of California

11

severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (footnote omitted).  If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, she is conclusively presumed to be disabled, without considering age, education and work experience.  20 C.F.R. § 404.1520(d).  Here, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met the listings.  AR 14.

If the claimant does not meet or equal a listing, the ALJ proceeds to step four and assesses the claimant's residual functional capacity ("RFC"), defined as the most the claimant can still do despite their limitations, 20 C.F.R. § 404.1545(a)(1), and determines whether they are able to perform past relevant work, defined as "work that [the claimant has] done within the past 15 years, that was [SGA], and that lasted long enough for [the claimant] to learn to do it," *id.* § 404.1560(b)(1).  If the ALJ determines, based on the RFC, that the claimant can perform past relevant work, the claimant is not disabled.  *Id.* § 404.1520(f).  Here, the ALJ determined Plaintiff had the RFC to perform a full range of work at all exertional levels but that she had the following non-exertional limitations: she was limited to simple, routine tasks and simple work-related decisions, and she could only occasionally interact with coworkers and the public.  AR 15.  The ALJ determined here that Plaintiff had no past relevant work.  AR 20.

At step five, the burden shifts to the agency to prove that "'the claimant can perform a significant number of other jobs in the national economy.'"  *Ford*, 950 F.3d at 1149 (quoting *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002)).  To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines found at 20 C.F.R. Pt. 404 Subpt. P, App. 2,[3] or on the testimony of a vocational expert.  *Ford*, 950 F.3d at 1149 (citation omitted).  "[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's

---

[3] The Medical-Vocational Guidelines "relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461(1983).  The Guidelines "consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Id.* at 461-62 (footnotes omitted). The guidelines are commonly known as "the grids". *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).

United States District Court
Northern District of California

1

2

3

4

5

medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy."  20 C.F.R. § 404.1560(b)(2).  An ALJ may also use "other resources," such as the DOT.  *Id.*  Here, the ALJ accepted the VE's testimony and determined there were jobs in significant numbers in the national economy that Plaintiff could perform.  AR 21.

6

7

8

9

10

11

The ALJ issued his decision finding Plaintiff not disabled on March 14, 2018.  AR 8-22.  The decision became final when the Appeals Council declined to review it on December 12, 2018.  AR 1-5.  Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On September 6, 2019, Plaintiff filed the present Motion for Summary Judgment.  On February 20, 2020, Defendant filed a Cross-Motion for Summary Judgment.

12

### IV.   STANDARD OF REVIEW

13

14

15

16

17

18

19

20

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  An ALJ's decision to deny benefits must be set aside only when it is "based on legal error or not supported by substantial evidence in the record."  *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and quotation marks omitted).  It requires "more than a mere scintilla" but "less than a preponderance" of the evidence.  *Id.*; *Trevizo*, 871 F.3d at 674.

21

22

23

24

25

26

27

28

The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Trevizo*, 871 F.3d at 675 (citation and quotation marks omitted).  However, "[w]here evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  *Id.* (citation and quotation marks omitted).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation and quotation marks omitted).

United States District Court
Northern District of California

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (citation and quotation marks omitted). A court may not reverse an ALJ's decision because of a harmless error. *Id.* at 1111 (citation omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Id.* (citation and quotation marks omitted).

## V.   DISCUSSION

### A.   Plaintiff's Arguments

Plaintiff argues that: (1) the ALJ erred by rejecting the opinions of her treating and examining clinicians without giving specific, legitimate reasons supported by substantial evidence; (2) the ALJ erred at step two by failing to include learning disability, cognitive impairment, psychosis, and PTSD among Plaintiff's impairments; (3) the ALJ erred at step three in finding that Plaintiff's impairments did not meet listing 12.05 and by failing to consider listing 12.11; (4) the ALJ erred by failing to identify which portions of Plaintiff's testimony were not credible and by failing to provide clear and convincing reasons for rejecting her testimony; (5) the ALJ's RFC finding was not supported by substantial evidence; and (6) the ALJ erred at step five by relying on VE testimony based on an incomplete hypothetical.

#### 1.   The ALJ's Weighing of Medical Opinions

##### a.   The Opinions of Special Education Evaluators and Providers

Plaintiff's argues that the ALJ erred by ignoring special education assessments from Plaintiff's time in school, along with the opinions of her special education providers.

In determining whether a claimant is disabled, an ALJ must consider medical opinions in the case record together with the rest of the relevant evidence in the record. 20 C.F.R. § 416.927(a)(2). The same goes for determinations for young adults, defined as individuals between the ages of 18 and 25. SSR 11-2p ("We consider people between the ages of 18 to approximately 25 to be young adults."); *id.* § (I) ("[W]e consider all relevant evidence in the case record to determine whether a young adult is disabled. This evidence may come from acceptable medical

United States District Court
Northern District of California

sources and from a wide variety of 'other sources.'") (citing 20 CFR 404.1513(d) and 416.913(d)). Because "[t]he abilities, skills, and behaviors that young adults use to do basic work activities are the same as those that older adolescents use for age-appropriate activities," the evidence an ALJ considers in making a disability determination for a young adult "is generally the same as, or similar to," evidence an ALJ considers in making determinations for older adolescents.  SSR 11-2p.  Thus, like with determinations for older adolescents, records from special education school programs can be relevant to determinations for young adults.  *Id.* § (I)(C).  For example, young adults receiving special education services will have Individualized Education Programs (an "IEP").  *Id.* § (I)(C)(2).  IEPs might provide details on a young adult's functioning in school programs, which evidence might indicate how well the person can use her physical or mental abilities to perform work activities.  *Id.* § (II)(A).  Certain "school-reported difficulties," such as "difficult maintaining attention for extended periods in a class," might portend difficulty with work activities.  *Id.* § (II)(A) (listing categories of difficulties which might indicate difficulty with work activities).  In addition, listing 12.05, *Intellectual disorder*, requires evidence that a claimant's intellectual disorder began prior to age 22 and specifically names special education records, IEPs, and reports of academic performance and school functioning as examples of such evidence.  20 C.F.R. § 404, Subpt. P, Appx. 1, 12.00(H)(4).

Plaintiff argues that the ALJ ignored and therefore implicitly rejected the opinions of several medical professionals who conducted psychological evaluations and learning assessments of Plaintiff during her childhood.  In particular, she points to a set of records completed by various school psychologists and social workers in 2002 and 2003, and limited IEP notes from 2004 and 2006.  *See* Pl.'s MSJ at 7 (citing AR 400, 407-08, 411, 427-28), Pl.'s MSJ at 8 (citing AR 270, 274-75, 277, 281).  The ALJ cited Plaintiff's education records while noting that the record contained "many exhibits dated before 2011 and well before the claimant filed her application on March 11, 2015."  AR 16.  He noted, however, that from the alleged onset date, March 15, 2011, through mid-2015, Plaintiff "received little, if any, mental health treatment."  *Id.*  In fact, he noted, Plaintiff did not receive any treatment in 2011 or 2012, "indicating a significant gap in care since at least July 2010."  *Id.* (citing AR 458 (Plaintiff's representative's brief indicating no treatment

United States District Court
Northern District of California

1    from July 2010 to September 2015)).  The record is consistent with those findings.  As the ALJ

2    explained, after July 2010 the next time Plaintiff sought any medical care was in April 2013 and

3    November 2014, for complaints unrelated to her mental impairments.  *See* AR 498 (4/14/13

4    emergency department admission for medical health issue), 534 (11/28/14 admission for the

5    same).  Plaintiff's next emergency department visit after that came in April 2015, again for

6    complaints unrelated to her mental impairments.  AR 17 (citing AR 578 (4/3/15 admission)).

7    Plaintiff does not dispute the ALJ's assessment of the record, and in fact, her representative's brief

8    doesn't include any discussion of treatment for mental impairments from July 2010 to September

9    2015.[4]  AR 458.  And even after September 2015, the ALJ noted, the record showed a history of

10   only "intermittent treatment" of Plaintiff's mental impairments.  AR 17.  The lengthy and

11   unexplained gap in treatment, from months before the alleged onset date through late 2015, was a

12   specific and legitimate reason for finding immaterial Plaintiff's childhood records, especially

13   when those records preceded a period of non-treatment by several years.  Because the records

14   were not significant or probative, the ALJ committed no error by not specifically discussing each

15   record.  *See Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) ("in interpreting the

16   evidence and developing the record, the ALJ does not need to discuss every piece of evidence,"

17   and "is not required to discuss evidence that is neither significant nor probative") (citations and

18   internal quotation marks omitted); *Carmickle v. Comm'r, Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir.

19   2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance.")

20   (citing *Fair v. Bowen*, 885 F.2d 597, 600 (9th Cir. 1989)); *see Fair*, 885 F.2d at 603 ("an

21   unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of

22   treatment" may be a basis for an adverse credibility finding).

23           Furthermore, Plaintiff mischaracterizes somewhat the educational records which she cites.

24   She cites psychological evaluations by Drs. Jacob Barak, Ph.D. and Robert Maginn, Ph.D., and

25   writes that they opined that her academic functioning was "far below expectations because of

26

27   _____

     [4] This period of non-treatment roughly coincides with the time between when Plaintiff had her SSI
28   claim dismissed on age-18 re-determination, December 13, 2010, *see* AR 81-82, and when
     Plaintiff protectively filed for benefits in August 2015.

United States District Court
Northern District of California

attention and visual motor integration deficits and that her cognitive skills deteriorated under stress." Pl.'s MSJ at 8 (citing AR 400, 428). But Dr. Barak wrote in early 2003 that Plaintiff was "below age level expectations" (not "far" below) in academic functioning and wrote that her global intellectual functioning was estimated in the average range even though she might not "function to this level on a daily basis because of attention deficits and visual motor integration weaknesses." AR 400. And Dr. Maginn wrote in early 2002 that Plaintiff's educational history was "unremarkable," that her "grades were described as good," that her intellectual functioning was estimated in 2001 to be in the average to above average range, and that while she had "specific deficits in regard to perceptual organization and motor coordination," these deficits were "relative and [] not [then] interfering with her performance at school." AR 425, 428.

Plaintiff only briefly discusses her IEPs when she writes that they "indicated that she required extensive accommodations, including, inter alia, full-time specialized instruction due to her processing and emotional disorders, small classroom size, and a behavioral intervention plan." Pl's MSJ at 8 (citing AR 274-75, 281). While it is true that the IEP records indicated a need for a small-group classroom environment, the records which Plaintiff cites include no mention of emotional problems. Also, the IEP records indicated that Plaintiff's primary areas of need were academic or behavioral (and even then, predominantly academic), and not "social/emotional," "pre-vocational/vocational," "communication," "perceptual-motor," or other. *See* AR 275 (IEP part I mentioning "behavioral & academic needs"), 278 (IEP part II indicating only "academic" under "area of need"), 279 (same). And the IEPs did not provide in any detail any functional assessments nor identify any vocational and living skills Plaintiff needed to develop in order to function appropriately or independently. Hence the IEPs, prepared as they were some five years before Plaintiff's alleged onset date, are of no significant probative value. *See* SSR 11-2p § (I)(C) (IEP can identify skills needing development in order to function independently as an adult).

Lastly, although Plaintiff mentions—but doesn't discuss—listing 12.05 and cognitive impairments in discussing her educational records, the records do not support a finding of "significant subaverage general intellectual functioning" or "significant deficits in adaptive functioning," nor do they show a consistent full scale IQ score at or below 70, in order to satisfy

1   that listing.  *See, e.g.*, AR 400 (Plaintiff's intellectual functioning assessed in the average range),

2   425 (Plaintiff's intellectual functioning estimated in 2001 to be in the average to above average

3   range), 427 (verbal IQ of 98 and performance IQ of 79 in 2001, and Plaintiff's global intellectual

4   functioning within the low average range).  The educational records therefore do not support a

5   finding that Plaintiff met the listing for an intellectual disorder.

6           The ALJ committed no error in discounting Plaintiff's educational records.

7                           **b.       Dr. Catlin's Opinion**

8           Plaintiff next argues that the ALJ erred because he ignored the IQ and neurocognitive test

9   scores assessed by Dr. Catlin without discussion, and because he rejected Dr. Catlin's opinion that

10  Plaintiff's mental impairments resulted in severe non-exertional limitations for reasons that were

11  not specific, legitimate, or supported by substantial evidence.

12          In deciding how much weight to give to any medical opinion, the ALJ considers the extent

13  to which the medical source presents relevant evidence to support the opinion.  20 C.F.R. §

14  416.927(c)(3).  Generally, more weight will be given to an opinion that is supported by medical

15  signs and laboratory findings, and the degree to which the opinion provides supporting

16  explanations and is consistent with the record as a whole.  *Id.* § 416.927(c)(3)-(4).  The better an

17  explanation a source provides for a medical opinion, the more weight will be given.  *Id.* §

18  416.927(c)(3).  Also, consistency between and within a medical source's records, and the

19  consistency of a source's opinion with the rest of the administrative record, are relevant when

20  weighing the source's opinions.  *Trevizo*, 871 F.3d at 675 (When an opinion is not controlling, "it

21  is weighted according to factors such as the length of the treatment relationship and the frequency

22  of examination, the nature and extent of the treatment relationship, supportability, consistency

23  with the record, and specialization of the physician.") (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

24  Internal inconsistencies in a source's reports are a legitimate reason for discounting that source's

25  opinion.  *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 603 (9th Cir. 1999) ("Determining whether

26  inconsistencies are material (or are in fact inconsistencies at all) and whether certain factors are

27  relevant to discount the opinions of" a source fall within an ALJ's responsibility to resolve

28  conflicts and ambiguity in the record.).  If a treating or examining doctor's opinion is contradicted

United States District Court
Northern District of California

1    by another doctor's opinion, an ALJ must provide specific and legitimate reasons, supported by

2    substantial evidence, for rejecting it.  *Trevizo*, 871 F.3d at 675 (citation omitted).

3         The ALJ gave little weight to Dr. Catlin's opinion because he found it was internally

4    inconsistent.  He noted, for example, that Dr. Catlin indicated that Plaintiff had suffered more than

5    three episodes of decompensation although Plaintiff reported no psychiatric hospitalization as an

6    adult.  AR 18.  He also found Dr. Catlin's opinion was inconsistent with the record as a whole.

7    For instance, he noted that Plaintiff reported to Dr. Catlin that she had no history of substance use

8    or abuse, but that the record showed that she had a significant history of substance abuse dating

9    back to her adolescent years.  AR 18-19 (citing AR 1052-53, 967, 932).  This discrepancy, the

10   ALJ wrote, indicated that Plaintiff was not forthcoming with Dr. Catlin, which undermined Dr.

11   Catlin's ability to properly evaluate the nature, cause, or severity of Plaintiff's alleged symptoms.

12   Lastly, the ALJ noted that Plaintiff endorsed auditory hallucinations and abnormal thought content

13   when being evaluated by Dr. Catlin, but had denied them just days earlier in her evaluation with

14   Dr. Kollath, and "[the] issue ha[d] not been consistently raised during her medical and mental

15   health visits."  AR 19 (citing AR 1207 (July 2017 hospital discharge record showing Plaintiff

16   denied auditory or visual hallucinations, denied suicidal or homicidal ideation, and had no

17   delusions)).

18        First to Plaintiff's complaint that the ALJ ignored the IQ and neurocognitive test scores

19   assessed by Dr. Catlin, that complaint is not accurate.  The ALJ did not discredit the score.  He

20   noted that the record did not show evidence that Plaintiff had an IQ score representing

21   significantly subaverage intellectual functioning by the age of 22, or that Plaintiff had significant

22   deficits in adaptive functioning.  Without significant deficits in adaptive functioning, a claimant

23   cannot meet listing 12.05.

24        Plaintiff next argues that the ALJ erred in rejecting Dr. Catlin's opinion that her mental

25   impairments resulted in severe non-exertional limitations.  She argues that under the Social

26   Security regulations in effect at the time of Dr. Catlin's report, hospitalizations were not required

27   to demonstrate an episode of decompensation.  She points out that Dr. Catlin did not discredit

28   Plaintiff's subjective complaints.  And she points out that she reported auditory hallucinations to

1   numerous providers as an adult and that she was observed to have abnormal thought content as a

2   child.  AR 10-11 (citations omitted).  However, none of that detracts from the ALJ's finding that

3   Plaintiff was not fully forthcoming as shown by the fact that she denied to Dr. Catlin any history

4   of substance use or abuse.  As the ALJ pointed out, the record indicates a significant history of

5   substance use or abuse, including, as the ALJ pointed out, Plaintiff reporting a history of substance

6   abuse in March 2010 including "drinking three cups of gin per day for the last two years" and

7   "[s]ince 2007 . . . smoking marijuana 10 times a day," AR 1052-53; a diagnosis by Dr. Morey

8   Weingarten, M.D., in that same record of "bipolar disorder by history, alcohol and marijuana

9   abuse- rule out dependent," AR 1054; and Plaintiff reporting a history of substance abuse in her

10  evaluation with Dr. Kollath, only a week before meeting with Dr. Catlin, AR 669.  Other records

11  also document drug use or abuse in the year or so preceding Dr. Catlin's evaluation.  *See also,*

12  *e.g.*, AR 611 ("patient currently uses drugs, abuses marijuana" in November 2015), AR 553

13  (occasional marijuana use reported in September 2015); AR 507 (marijuana and cocaine use

14  documented in November 2014).

15        An ALJ may properly give less weight to the evaluation of a medical source where the

16  claimant has not been forthcoming about alcohol and substance use.  *Tate v. Astrue*, 431 Fed.

17  Appx. 565, 565 (9th Cir. 2011); *see Coffman v. Astrue*, 469 Fed. Appx. 609, 611 (9th Cir. 2012)

18  ("The evidence suggests that [the claimant] reported drinking daily and abusing prescription drugs

19  to some mental health professionals while denying past and present substance abuse to others. . . .

20  These are clear and convincing reasons to discount the opinions of the examining psychologists.");

21  *Savage v. Comm'r of the SSA*, 158 Fed. Appx. 924, 925 (9th Cir. 2005) ("Because we find it

22  reasonable to conclude from the evidence that [the claimant] had recently used more drugs or

23  alcohol than she reported to [the doctors], we determine that the ALJ offered a legitimate

24  justification sufficiently supported by the evidence for giving their opinions limited weight in

25  evaluating [the claimant's] capacity exclusive of substance abuse.").  It's not really relevant that

26  Dr. Catlin credited Plaintiff's subjective complaints, as the whole issue with Plaintiff concealing

27  her drug use was that she evidently was not fully forthcoming with Dr. Catlin, undermining the

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   foundation of Dr. Catlin's assessments.[5]  Finally, it bears repeating that from July 2010 to

2   September 2015—about four months before Dr. Catlin's evaluation—Plaintiff received no mental

3   health treatment at all, with no clear explanation for why, and when she reestablished care she

4   hadn't taken any medications prescribed for her mental health since 2011.[6]  *See* AR 684.  Also, the

5   ALJ assigned significant weight to the opinion of Dr. Kollath, who wrote that Plaintiff was

6   "independent for basic ADL's" and opined that Plaintiff had mostly only mild impairments in

7   work-related abilities; Plaintiff does not challenge the weight the ALJ afforded to that opinion, so

8   there is at least one directly contradictory doctor's opinion in the record.

9                        **c.    BACS Treatment Notes**

10          Plaintiff argues that the ALJ rejected the opinions of Plaintiff's treatment providers from

11   BACS without providing specific and legitimate reasons.  Plaintiff argues that the ALJ dedicated

12   only a few sentences to these notes and opinions while summarizing the medical evidence.

13   Plaintiff homes in on the ALJ's decision to give "little weight" to the "range of GAF scores"

14   contained in the BACS records, AR 19, but in doing so she overlooks other times the ALJ

15   referenced the BACS records.  The ALJ devoted a full paragraph to discussing Plaintiff's records

16   from 2016 and 2017, and in doing so specifically discussed the BACS records.  AR 17.  He noted

17   that while Plaintiff received some mental health treatment during those years, she was also using

18   substances.  *Id.*  He noted that she was hospitalized in June 2016 for severe abdominal pain after

19   smoking methamphetamine throughout the prior night, AR 1167-68, and that lab work from that

20   time confirmed that Plaintiff was using cocaine, amphetamines, and marijuana, AR 1171.  The

21   ALJ noted that in May 2017 Plaintiff returned to treatment with Alameda County Behavioral

22

23   [5] Plaintiff suggests at one point that "[a]ny minor inconsistencies in Plaintiff's reporting are
     readily explained by her documented cognitive impairments, including difficulty with verbal
24   comprehension, poor memory, confusion, and disorganization."  Pl.'s MSJ at 22.  The Court does
     not find that the record supports, and Plaintiff does not point the Court to any evidence supporting,
25   the conclusion that Plaintiff so suffered from cognitive impairments that she would be unable to
     properly report whether or not she used drugs or alcohol or had a history of abuse.
26   [6] Later in her brief, in discussing her non-compliance with treatment, Plaintiff suggests that her
     non-compliance can be attributed at least in part to a diagnosis of avoidant personality disorder.
27   Pl.'s MSJ at 20-21.  To the extent she means to extend that argument to her non-compliance with
     prescribed medication, she fails to explain how the two are linked (i.e., how her alleged inability to
28   interact with treatment providers carries over into her non-compliance with prescribed medication,
     including once quitting "cold turkey").

21

Health Care Services (BACS), but that by August 4, 2017 her providers noted that, despite asking for help, Plaintiff repeatedly cancelled appointments or failed to appear. AR 17. The ALJ noted that there was no indication that Plaintiff renewed her requests for treatment after that. *Id.* He again cited Stanley's notes later when rejecting Plaintiff's allegations of disabling symptoms based in part on her being noncompliant with treatment and "fail[ing] to show [up] for appointments after asking for support." AR 20 (citing AR 1292). Ultimately, he found that Plaintiff "ha[d] not received the type of medical treatment one would expect for a disabled individual." AR 20. Plaintiff's failure to attend treatment sessions or follow through on treatment with BACS, to the point where her treatment providers planned to terminate services, was a specific and legitimate reason for assigning little, if any, weight to medical opinions contained therein. The ALJ's decision to give little weight to the GAF scores contained in the BACS records was appropriate for the same reason. The ALJ also noted that Plaintiff's GAF score increased, and her symptoms improved, after she was hospitalized and entered treatment, her medication levels were restored, and intoxicants such as methamphetamine and alcohol cleared from her system. *See, e.g.*, AR 1244 (GAF 25-30 on admission and 55 at discharge). The ALJ found this showed that the GAF scores were not an accurate description of Plaintiff's overall functioning over time. AR 19. That was a legitimate reason supported by the record.

Lastly, Plaintiff takes issue with the ALJ's assignment of "some limited weight" to an August 22, 2017 letter from Stanley to Plaintiff's legal representative. AR 1294-95. However, Plaintiff doesn't explain what about that letter should have been given more weight. The ALJ correctly noted that the letter did not directly address work limitations or Plaintiff's substance use but did discuss Plaintiff's failures to maintain appointments or manage her psychiatric medications.

The ALJ committed no error in the weight he assigned to the BACS records.[7]

---

[7] Although speaking of opinions in the BACS records, the Court notes again that Stanley wrote in April, 2017, in what is one of the most recent diagnoses in the record, that while Plaintiff met the criteria for major depressive order, she did meet "any other criteria for psychotic disorders, anxiety disorders, mood disorders, or adjustment disorders, at this time," and though she reported a history of trauma, she did not meet the criteria for PSTD.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### d.    Opinions from Dr. Gluck and Therapist Ung

Plaintiff argues that at step two and in determining Plaintiff's RFC, the ALJ improperly rejected the opinions of Dr. Gluck and Therapist Ung without explanation.  In particular, she points out that Dr. Gluck opined that she met the criteria for schizoaffective disorder, bipolar type and polysubstance abuse/dependence, and that Ung opined that she was unable to cope with stress, recognize her disability, or understand why medication was prescribed to her.  *See* AR 1244, 1251.  However, Plaintiff points to no opinion of either Dr. Gluck or Ung that speaks to any functional limitations, and she does not point out where in the ALJ's decision he supposedly rejected Dr. Gluck or Ung's opinions overall.  Also, these records were generated when Plaintiff was hospitalized on two occasions after having ingested methamphetamine and alcohol, and, as the ALJ noted, on both occasions her condition and symptoms quickly improved after intoxicants cleared her system.  AR 1207-08, 1244-46 ("The patient was admitted . . . where she was initially 'crashing' from the use of psychostimulants.").  As said earlier, an ALJ need not discuss every piece of evidence in the record, especially where, as here, the medical record runs in the ballpark of a thousand pages.  The ALJ properly evaluated the evidence in assessing Plaintiff's RFC.

### e.    Medical Opinions from Before the Alleged Onset Date

Lastly, Plaintiff argues that the ALJ erroneously rejected the opinions, assessments, and GAF scores that were issued prior to the alleged onset date when he wrote that "they have no probative value in determining the claimant's functioning since the alleged onset date."  AR 19.  Plaintiff argues that "[t]his conclusory statement is not specific and legitimate or clear and convincing."  Pl.'s MSJ at 13.  But then all she does is cite a range of 220 pages in the record and assert that her childhood mental health treatment records support the conclusion that she had cognitive impairment that began prior to age 22, *id.* (citing AR 704-923); she points to no individual piece of evidence that would support that conclusion.  This argument doesn't warrant a discussion.

### 2.    The ALJ's Step-Two Findings

Plaintiff argues that the ALJ failed at step two when by not including learning disability, cognitive impairment, psychosis, and PTSD among Plaintiff's severe impairments.

23

As a preliminary point, Plaintiff only alleged disability based on bipolar disorder, mood disorder, and dysthymic disorder.  AR 87, 99, 202.  Thus, the ALJ stated that he considered whether Plaintiff met listings 12.02, *Neurocognitive disorders*, 12.03, *Schizophrenia spectrum and other psychotic disorders*, 12.04 *Depressive, bipolar and related disorders*, 12.06, *Anxiety and obsessive-compulsive disorders*, and 12.15, *Trauma- and stressor-related disorders*.  AR 14.  However, as the ALJ noted, Plaintiff's representative also argued that Plaintiff's impairments met listings 12.05, *Intellectual disorder*, and 12.08, *Personality and impulse-control disorders*, and so the ALJ also stated that he considered whether Plaintiff met those listings as well.  AR 14.  The ALJ went on to discuss the relevant evidence, including considering any limitations posed by Plaintiff's impairments, at steps three and four of his decision.  As Plaintiff herself acknowledges, the ALJ explained that he considered how she earned a full-scale IQ score of 61 on two occasions, but that the record did not show "evidence of this condition prior to 22 or that the claimant carries significant deficits in adaptive functioning."  AR 14.  Plaintiff also acknowledges how "[t]he ALJ referenced Plaintiff's psychotic symptoms in other parts of the decision," Pl.'s MSJ at 15, so it's clear the ALJ didn't simply ignore that evidence.  Lastly, while Plaintiff takes issue with the ALJ's finding that she had no additional severe impairments at step two, she does not attempt to explain how that finding, if it were in error, led to erroneous findings at any other step.  To the extent the ALJ erred by not including those additional severe impairments at step two, the error was harmless.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("The decision reflects that the ALJ considered any limitations posed by the bursitis at Step 4.  As such, any error that the ALJ made in failing to include the bursitis at Step 2 was harmless.").

### 3.     The ALJ's Step Three Findings

Plaintiff argues that the ALJ erred at step three by erroneously concluding that Plaintiff's impairments did not meet listing 12.05, *Intellectual disorder*, and by failing to consider whether Plaintiff's impairments met or equaled listing 12.11, *Neurodevelopmental disorders*.

For a claimant to meet listing 12.05, she cannot do so only by showing a full-scale IQ score of 70 or below alone.  She must also show either "significant deficits in adaptive functioning currently manifested by [] dependence upon others for personal needs" or "extreme limitation of

one, or marked limitation of two," of the broad areas of mental functioning, along with evidence that the disorders began prior to age 22.  Plaintiff argues that she met the second requirement "because Dr. Catlin opined that Plaintiff has several marked and extreme limitations in activities of daily living, concentration, persistence, and pace, and social functioning, and her opinion is consistent with those of Plaintiff's BACS providers and with the record as a whole."  But as already discussed, the ALJ supported his rejection of Dr. Catlin's assessment of severe and marked impairments with specific and legitimate reasons that were supported by evidence in the record.  And to the extent any BACS record even supports a finding that Plaintiff meets listing 12.05 (and Plaintiff doesn't say which part of BACS records would), the ALJ also committed no error in assigning little weight to the opinions expressed in those records.  The ALJ also found, accurately, that the record did not show evidence of a qualifying full-scale IQ prior to age 22 or that Plaintiff had significant deficits in adaptive functioning.  AR 14.  Thus, the ALJ permissibly determined that Plaintiff did not meet listing 12.05.

Regarding listing 12.11, Plaintiff did not allege disability based on neurodevelopmental disorders, and her representative did not make the argument before the ALJ that she met that listing.  *See* AR 461-64.  Consequently, this argument is waived.  *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) ("[W]hen Plaintiffs are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal"; "appellants must raise issues at their administrative hearings in order to preserve them on appeal before this Court"); *Harshaw v. Colvin*, 616 Fed.Appx. 316, 316 (9th Cir. 2015) (unpublished) (claimant waived argument that he had additional severe impairments "by raising it for the first time before the district court").  Also, an ALJ is not required to discuss each and every listing when evaluating whether a claimant meets or equals a listing at step three.  *Abreu v. Astrue*, 303 Fed.Appx. 556, 557 (9th Cir. 2008) ("The ALJ is not required to perform a detailed analysis for every possible listing").

### 4.     Plaintiff's Testimony

Plaintiff argues that the ALJ erred by rejecting her testimony without adequately articulating reasons for doing so.  She argues that the reasons the ALJ did give were not clear and

convincing or supported by substantial evidence.

"In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. 'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). And second, "if the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives 'specific, clear and convincing reasons' for the rejection." *Vasquez*, 572 F.3d at 591 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). "At the same time, the ALJ is not required to believe every allegation of [symptoms], or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Molina*, 674 F.3d at 1112 (citation and internal quotations omitted). Along the same lines, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3P, 2016 WL 1119029, at *2. In determining whether an individual's symptoms will reduce her capacities to perform work-related activities or abilities to function, "the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct; unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and whether the claimant engages in daily activities inconsistent with the alleged symptoms." *Molina*, 674 F.3d at 1112 (citations and internal quotation marks omitted). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, [the ALJ] will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3p, 2016 WL 1119029, at *7.

As a preliminary point, the ALJ did not reject Plaintiff's testimony across the board. Nor did he ignore it. He noted that Plaintiff testified that "she does not handle stress well," AR 15, that "her daily activities include watching television, sleeping, and cooking noodles," *id.*, "that she

26

United States District Court
Northern District of California

1    does not like to be around people and that she has issues with attention and concentration," AR 16,

2    that when she worked "she found it difficult to remember and [] could not handle stress," *id.*, and

3    that she tended to get into confrontations with others and was terminated for fighting with a

4    coworker, *id.*  He found that Plaintiff's "medically determinable impairments could reasonably be

5    expected to cause the alleged symptoms," *id.*, in other words, he credited Plaintiff's testimony that

6    her impairments caused symptoms that could have an impact on her functioning.  However, he

7    rejected Plaintiff's statements concerning the intensity, persistency and limiting effects of the

8    symptoms, finding they were not entirely consistent with the medical evidence and other evidence

9    in the record.  *Id.*  More specifically, the ALJ rejected Plaintiff's "assert[ions] that she could

10   perform no substantial gainful activity on a sustained basis because of her symptoms." AR 20.  As

11   reason for rejecting Plaintiff's "allegations of disabling symptoms," *id.*, the ALJ noted that

12   Plaintiff: had been noncompliant with treatment, "[f]or example . . . not follow[ing] through with

13   seeing her psychiatrist and refilling medication;" had "failed to show for [sic] appoints after asking

14   for support;" "had not been consistent with the nature and extent of her symptoms and her

15   history;" "denied a history of substance use to Dr. Catlin"—the only medical source to assess

16   marked or severe limitations in areas of mental functioning—which denial was "contrary to the

17   record;" had not been consistent in reporting auditory hallucinations to providers; and "[o]verall . .

18   . has not received the type of medical treatment one would expect for a disabled individual, and

19   her daily activities are not limited to the extent one would expect[] given the complaints of

20   disabling symptoms and limitations." *Id.*  These are permissible factors to consider in determining

21   the credibility of a claimant's allegations as to the severity of the impact of her impairments.  *See*

22   *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (listing factors that the ALJ permitted to

23   consider in analyzing the credibility of a claimant's allegations of symptoms) (citations omitted).

24   Furthermore, the ALJ supported these reasons with more than four pages discussing the evidence

25   in the record that supported them.  *See* AR 16-20.  This is a far cry from the sort of boilerplate

26   rejection of statements of intensity or persistence that the Ninth Circuit has found doesn't meet the

27

28

27

United States District Court
Northern District of California

1    mark.[8]  *See, e.g.*, *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (an ALJ errs "by

2    making only a single general statement that 'the claimant's statements concerning the intensity,

3    persistence and limiting effects of these symptoms are not credible to the extent they are

4    inconsistent with the above [RFC] assessment,'" without identifying specific reasons supported by

5    evidence in the record).

6         Plaintiff argues that her noncompliance with treatment and medication is not a clear and

7    convincing reason because "the record provides multiple explanations for [her] difficulty

8    consistently accessing treatment and complying with her medications, none of which was

9    considered by the ALJ."  Pl.'s MSJ at 20.  In addition, she argues, she has been diagnosed with

10   avoidant personality disorder and the ALJ did not consider how her persistent pattern of social

11   avoidance impacts her ability to interact with treatment providers.  Generally, an ALJ "will not

12   find an individual's symptoms inconsistent with the evidence in the record" on the basis of lack of

13   treatment or non-compliance with treatment, "without considering possible reasons he or she may

14   not comply with treatment or seek treatment consistent with the degree of his or her complaints."

15   SSR 16-3p.  But the record does not support Plaintiff's explanation that she was unable to access

16   treatment or comply with medications because her impairments prevented her from doing so.  For

17   one thing, Plaintiff did not allege disability based on listing 12.08, *Personality and impulse-*

18   *control disorders*, and the ALJ did not—contrary to Plaintiff's assertion—find that Plaintiff had a

19   severe impairment due to the disorder.  Also, Plaintiff only points to two instances in the record

20   that show a diagnosis of avoidant personality disorder: one was in 2010, AR 1103, and the other

21   was by Dr. Catlin, whose opinion the ALJ permissibly assigned little weight.  There is also

22   evidence in the record which suggests that Plaintiff's lack of treatment was not due to difficulties

23   due to her impairments.  For example, she reported that she had stopped taking medications

24   because they "ma[de] her fat;" a BACS note from June 13, 2017 indicated that Plaintiff "declined

25

26   ─────────────────────

27   [8] Plaintiff argues that "[t]he ALJ was required to provide specific, clear, and convincing reasons in
     the credibility section of his decision to properly discredit Plaintiff's testimony but failed to do
     so."  Pl.'s MSJ at 20.  The ALJ appropriately provided his reasons in the section of his decision
28   discussing Plaintiff's RFC.  To the extent that Plaintiff, in essence, takes issue with the
     organization of that section, *see id.*, she is attempting to elevate form over substance.

[clinician] support in connecting her to psychiatry as she explained that she was 'too sleepy to attend' and wanted to reschedule," and that she "also declined [a clinician's] connection to support in obtaining medication to decrease [symptoms] as she repeatedly stated, 'I got it.  I can do it by myself,'" AR 1287; and when Plaintiff began to re-establish care with LifeLong, a chart note from April 2016 indicated that her attorney at Legal Aid "suggest[ed] she get back on medication.  SSI was cut b/c not taking medication," AR 684.  (Additionally, the culmination of Plaintiff's four visits with LifeLong from September 2015 to June 2016 included a prescription for headache medication and vitamins.).

Finally, Plaintiff argues that the daily activities that the ALJ listed, when concluding that Plaintiff's daily activities were not limited to the extent one would expect, do not meet the threshold of activities that are transferability to a work setting.  The ALJ pointed out that Dr. Kollath noted that Plaintiff was "independent for basics ADL's," and that Plaintiff did not need help preparing meals, could make change at the store, and could take public transport.  The problem with Plaintiff's argument here is that she does not point to any portion of her testimony or piece of evidence which suggests that her activities of daily living were significantly impacted by her impairments, or that Plaintiff required help from family members or professional care to help her function.  She testified that she sleeps all day and that she quit a job because "the stuff" took "too long," but neither of those facts necessary suggests any disabling effects caused by Plaintiff's impairments.

The ALJ provided specific and legitimate reasons for discounting Plaintiff's allegations as to the intensity, persistence, and limiting effects of her impairments or symptoms, and the reasons were supported by substantial evidence in the record.

### 5.      The RFC

Plaintiff contends that the ALJ's RFC is not supported by substantial evidence.  Plaintiff bases her argument here on the opinions of the various providers that she argued the ALJ properly discounted, the limitations that she argued were not properly included at step two, and on her argument that the ALJ improperly rejected her testimony.  Those arguments were unsuccessful.  Also, it is the ALJ's duty to determine the RFC and an RFC is not based on a doctor's opinion or

United States District Court
Northern District of California

claimant's testimony.  20 C.F.R. § 416.927(d); *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  Consequently, the Court's analysis here is limited to whether the ALJ conducted a detailed review of the record and assessed an RFC that is supported by substantial evidence.  He did, and thus he committed no error in assessing an RFC.

**6.      The Vocational Expert's Testimony**

Plaintiff's final argument is that the ALJ failed at step five by relying on VE testimony that resulted from an incomplete hypothetical posed by the ALJ to the VE.  At step five, the burden shifts to the agency to show the claimant can perform a significant number of other jobs in the national economy, and that burden can be met "by asking a [VE] a hypothetical question based on medical assumptions supported by substantial evidence in the record and reflecting all the claimant's limitations, both physical and mental, supported by the record."  *Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012) (citations omitted).  The only thing Plaintiff says here is that "the ALJ erroneously found that Plaintiff was not disabled at Step Five by relying on vocational testimony based on a hypothetical that does not accurately reflect Plaintiff's limitations and is not supported by substantial evidence."  Substantial evidence supports the ALJ's findings.  The VE's testimony resulted from a complete hypothetical.

## VI.    CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion.  The Court shall enter a separate judgment, after which the Clerk of Court shall terminate the case.

**IT IS SO ORDERED.**


Dated: September 27, 2020

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California

30